Law Library

FILED
SUPERIOR COURT
OF GUAM
2011 MAR 28 PM 2 47

# IN THE SUPERIOR COURT OF GUAM

CARL T. C. GUTIERREZ,                )
                                     )        CIVIL CASE NO. CV0544-05
                    Plaintiff,       )
                                     )
          vs.                        )
                                     )        **FINDINGS OF FACT**
                                     )        **AND**
                                     )        **CONCLUSIONS OF LAW**
GUAM POWER AUTHORITY,                )
GOVERNMENT OF GUAM,                  )
                                     )
                                     )
                    Defendant.       )
                                     )

## INTRODUCTION

This matter initially came before the Honorable Arthur R. Barcinas on the 10th day of October, 2007, for trial. Trial was completed on that day and the parties submitted their proposed findings of fact and conclusions of law on the 9th day of November, 2007. Attorney F. Randall Cunliffe represented the Plaintiff, and D. Graham Botha represented the Defendant. At trial, all of the exhibits submitted by the Defendant were admitted into evidence, and Exhibits 1 and 1.1 submitted by the Plaintiff were admitted. The Court now issues the following Findings of Fact and Conclusions of Law on the matter.

## FINDINGS OF FACT

This Court has jurisdiction over this matter pursuant to 7 GCA §3105. After hearing all the evidence and testimony presented in this case, this Court finds by a preponderance of the evidence, that:

1.      The Plaintiff appeared in this action by filing a Complaint on May 25, 2005. The Defendant Government of Guam appeared by filing an Answer on August 5, 2005. The Defendant Guam Power Authority separately appeared by filing its Answer on August 22, 2005. Later, the Defendant Government of Guam withdrew its Answer, and the parties agreed at hearing on October 4, 2005, that the

Government of Guam and the Guam Power Authority were being sued as a single entity, henceforth, representation would be provided by D. Graham Botha, and that the Answer filed by D. Graham Botha on behalf of Guam Power Authority would serve as the answer of the entity against whom suit had been filed.

2. On June 6, 2001, Lot 5014#1-2-2, one of several properties identified as the "GLUP 94 FOSET Parcels," was transferred by the United States of America/United States Naval government to the Guam Economic Development Authority (hereinafter "GEDA") by Quitclaim Deed Instrument No. 638645. Def.'s Ex. 3.

3. Plaintiff acquired Lot 5014# 1-2-2, Municipality of Dededo, Guam (hereinafter referred to as "Lot 1-2-2") from GEDA by Quitclaim Deed Instrument Number 691395, executed on April 20, 2004. Def.'s Ex. 4. Lot 1-2-2 is registered land, originally registered on October 28, 1952, under Certificate of Title No. 5682 by the Naval Government of Guam, for and on behalf of the United States of America, with a current area of approximately 9,004± square meters. Def.'s Ex. 2.

4. Plaintiff hired Frank L. G. Castro to conduct a survey of the property. After surveying the property in May of 2004, Mr. Castro created a map which was approved by the Guam Department of Land Management on July 30, 2004. Def.'s Ex. 2.

5. On this 2004 map, Mr. Castro identified the southern boundary between Lot 1-2-2 and Lot 5014#1-2-1(hereinafter referred to as "Lot 1-2-1"), which is a separate lot

that does not belong to the Plaintiff, to be located at N 70° 11' 58" E, with a length of 149.595 meters. Lot 1-2-1 is an easement for telephone poles, with a uniform width of 9.144 meters, an outer length of 151.1 meters, and an area of 1,371± square meters.

6.     Mr. Castro noted concrete power poles and telephone poles in and around Lot 1-2-2, on the 2004 map, using a symbol and the notation "cpp." As noted by Mr. Castro, in 2004, three concrete poles were located on or near the southern boundary of Lot 1-2-2, between Lot 1-2-2 and Lot 1-2-1; one concrete pole was located on the western boundary of Lot 1-2-2; and two concrete poles were located within the boundaries of Lot 1-2-2. Mr. Castro did not provide geographic points or specific locations for any of the concrete poles. He did not provide measurements of the distance of these poles from the southern, northern, western, or eastern boundaries of Lot 1-2-2. Mr. Castro made no mathematical measurements or notations of the locations of these poles on this map, and he also did not compute the possible area of encroachment of any of these concrete poles.

7.     The fact of the existence of some concrete poles within the boundaries of Lot 1-2-2, in 2004, is undisputed. Andriano E. Balajadia, a witness for the government/GPA testified that some concrete power poles were located within the boundaries of Lot 1-2-2 in 1989. However, no specific number of poles were identified by any of the witnesses at trial as being completely within the boundaries of Lot 1-2-2, and no actual measurements of the size/area or location of the alleged encroachment by the power poles were provided to the Court

through any of the witnesses or exhibits presented at trial by the Plaintiff. The most explicit references to the size of the area encompassed by the power poles presented by the Plaintiff at trial were the Plaintiff's two seemingly inconsistent statements that the poles would cause a loss of about "twenty (20) feet" of the frontage of the property along Marine Corps. Drive, with setbacks, and that the poles took up approximately "1,500 square meters" of the property.

8. Andriano E. Balajadia testified that the power poles on Lot 1-2-2 were placed there with the approval and permission of the U.S. Naval government in 1989, while the U.S. Naval government owned the land, and that the construction of the poles was a joint project between the U.S. Naval government and the Guam Power Authority (hereinafter "GPA"), with the two entities splitting the substantial costs and the labor required for the project. He further testified that the U.S. Naval government specifically refused to grant an easement to the Defendant, instead granting only permission and authorization to install the poles and transmission lines across Lot 1-2-2, and that GPA would not have entered Lot 1-2-2 and built these poles and lines without the U.S. Naval government's permission.

9. Both the Plaintiff and the Defendant presented testimony that Lot 1-2-2 is not currently zoned, and has never been zoned for any use while owned by the Plaintiff. The Plaintiff further testified that the businesses with whom he conducted negotiations were aware that they could not build on Lot 1-2-2 until it received zoning.

10. The Plaintiff testified that he considered entering into a lease agreement for Lot 1-2-2 with Payless Supermarkets, Inc., or a fill/service station, while the Defendant's poles were still located on the property. The Plaintiff conducted some talks with Leonard Calvo of Payless Supermarkets, Inc. towards this end. The Plaintiff testified that he has never intended to sell the property, and has only attempted to lease Lot 1-2-2.

11. Melinda Camacho, an employee of GPA, testified that all concrete power poles and transmission lines owned by GPA have been removed from inside the boundaries of Lot1-2-2, at the request of the Plaintiff. The Plaintiff also testified that to his knowledge there was one row of poles which was located on Lot 1-2-2, and that row had been removed. Neither witness testified as to when the power poles were removed, and no evidence of the length of time that the power poles remained on the Plaintiff's land was presented to the Court.

12. Michael Jury was hired by the Defendant to perform an appraisal report for Lot 1-2-2, which is dated June 12, 2006, and was submitted as Defendant's Exhibit 5. Mr. Jury testified that his report is an appraisal conforming to uniform standards applicable to appraisals. This appraisal contains estimated measurements of the area encroached by the concrete poles, with a conclusion that the area is approximately 1,277 square meters. However, this estimate is accompanied by a caveat stating: "The area of acquisition is an estimate by appraiser Michael T. Jury. It is recommended the estimate be confirmed by a Professional Land Surveyor." Def.'s Ex. 5, p. 29. Mr. Jury testified that the estimate he used in his

appraisal was approximately 28 feet wide, however, Mr. Jury did not testify as to the source of the measurements of the areas contained in this estimate, nor is the source of this information contained in the appraisal.

13.    Mr. Jury testified that he used the "before and after" method of appraisal for Lot 1-2-2 in conducting two analyses: (1) assuming a hypothetical easement lasting four years with a seven year limiting condition on the use of the land, as contained in the quitclaim deed to the Plaintiff, and (2) assuming a hypothetical easement lasting four years with no limiting conditions. Mr. Jury's appraisal states that the methodology he used in computing damages for Lot 1-2-2 is the method provided under the Uniform Appraisal Standards for Federal Land Acquisition (hereinafter UASFLA) for easement acquisition, which constitutes a partial acquisition, and the report quotes from the UASFLA, stating: "Federal courts have long held that the appropriate measure of compensation in a partial acquisition is the difference between the value of the whole parcel before the acquisition and after the acquisition. The courts accordingly have held this to be the proper measure of compensation in easement acquisitions." Def.'s Ex. 5, p.31 (quoting UASFLA (2000 edition)(citing United States v. Virginia Electric Co., 365 U.S. 624, 632 (1961); United States v. 8.41 Acres of Land, 680 F.2d 388, 392 (5th Cir. 1982); United States v. 38.60 Acres of Land, 625 F.2d 196, 198–99 (8th Cir. 1980); and Transwestern Pipeline Co. v. O'Brien, 418 F.2d 15, 21 (5th Cir. 1969)). Based upon the assumption that the Defendant had acquired an easement over Lot 1-2-2, Mr. Jury applied the "before and after" takings analysis to conclude in both

calculations that the Plaintiff was entitled to no compensation.

14. Nicholas Captain was hired by the Plaintiff to conduct a consulting study of Lot 1-2-2. This report is dated August 31, 2006, and was submitted as Plaintiff's Exhibit 1. Mr. Captain testified that this study is not an appraisal report, and does not contain the details necessary to meet applicable standards and laws governing appraisals. The consulting study does not contain a measurement of the area encroached by the power poles, however, Mr. Captain testified that he conducted the calculations in the consulting study using an assumed area for the encroachment of 1,277 square meters, which he rounded to 1,280 square meters. Mr. Captain stated that the basis for this assumption was information provided to him, however, he could not confirm the locations of the poles, or the accuracy of this information. The Court could not find any evidentiary support in the record for this assumed number, and it appears that this number was derived from the estimate contained in the appraisal conducted by Michael T. Jury. The statement of "Assumptions and Limiting Conditions" contained within the consulting study affirms that Mr. Captain did not complete a property survey.

15. Mr. Captain testified that he based his estimates of compensation in the consulting study on three different methodologies: a "before and after" analysis; a "DCF of Annual Damages Estimate;" and a "DCF with Reversion Only." Mr. Captain also prepared and provided the Court with a Summary of Revised Conclusions, as Plaintiff's Exhibit 1.1. He testified that this summary of conclusions contains conclusions for these three listed methodologies assuming an easement of only

three years, rather than four years, as contemplated in his original summary of conclusions contained within the consulting study. Mr. Captain's consulting study also included a page listing the requirements of a McDonald's Corp. franchise, although no testimony regarding the possible development of a McDonald's Corp. franchise on Lot 1-2-2 was elicited at trial.

16. The Court attaches no credence to Mr. Captain's conclusions regarding the "DCF of Annual Damages Estimate" and the "DCF with Reversion Only," as no analysis or factual basis was presented for either of these two conclusions. No support or validation was provided for any of the figures represented in these two conclusions. Only the "before and after" conclusion was accompanied by any documentation, explanation, or analysis. Pl.'s Ex.1, tab 3, Land Price Analysis - Before Taking; Land Price Analysis - After Taking, and Summary of Conclusions; Pl.'s Ex. 1.1, Revised Summary of Conclusions. Mr. Captain concluded, based upon his application of the "before and after" analysis, that the Plaintiff is entitled to $200,000.00 in damages if the Defendant acquired an easement for either three or four years.

17. The Plaintiff's only claim is for inverse condemnation.

18. The Plaintiff's formal request for relief is as follows: that the Defendant be required to pay a monthly rental value for the area of Lot 1-2-2 which was occupied by the Defendant from April of 2004 until the Defendant's vacation of the property, at a monthly rate of either $2,500.00 per month, or an amount of damages to be proven at trial.

19.    The Answer filed by the Defendant requests that the Plaintiff take nothing by way of relief.

**CONCLUSIONS OF LAW**

A)    <u>Was there a Taking?</u>

1)    <u>Plaintiff's Standing to Maintain Inverse Condemnation Action as Successor in Interest</u>

Eminent domain is the ability of a government entity to openly condemn private property through judicial proceedings and provide compensation to the landowner at the time of the taking. "[I]n contrast, an "inverse" or "reverse" condemnation proceeding arises from the landowner's attempt to receive compensation for a taking of property for public purposes when the government has not brought formal condemnation proceedings." <u>Cepeda v. Government of Guam</u>, 2005 Guam 11, ¶ 21 (Sup. Ct. Guam 2005)(citing <u>United States v. Clarke</u>, 445 U.S. 253 (1980)). Section 11311.1 of Title 7, Guam Code Annotated allows a landowner to institute an action to inversely condemn land when the government of Guam has effected a taking, but has provided no compensation to the landowner, and states:

§ 11311.1. Inverse condemnation. Any person whose land was expropriated for public purposes by the government of Guam between August 1, 1950, and July 1, 1994, and who has not been compensated by the government of Guam for such taking may institute an action for inverse condemnation. In any taking by the government of Guam after July 1, 1994, in which the government fails to follow the eminent domain provisions of Title 21, Guam Code Annotated, the person whose land is taken shall have four (4) years from the time of such taking to institute an action for inverse condemnation. An action shall lie for the taking of a person's fee or for lesser compensable interest in the property which has been expropriated by the government of Guam without according the person due process. In any action for inverse condemnation in which an award is made to a

person for a taking, the court shall also award reasonable attorney's fees and costs.

7 GCA § 11311.1 (2011).

Interpreting this statute, the Supreme Court of Guam has determined that "persons who were not the landowners at the time of the taking, or were not assigned the claims to compensation when they acquired the property, may file inverse condemnation claims." Cepeda v. Government of Guam, 2005 Guam 11, ¶ 18 (Sup. Ct. Guam 2005).

In this case, the alleged taking by the Defendant occurred in 1989 when the government of Guam/GPA erected concrete power poles somewhere within the boundaries of Lot 1-2-2. The Plaintiff admittedly did not acquire the property until 2004, however, based upon the holding in Cepeda, and the amendment to 7 GCA § 11311.1, removing the statute of limitations for takings which occurred prior to July 1, 1994, the Court finds that the Plaintiff may properly pursue a claim of inverse condemnation pursuant to Guam's inverse condemnation laws.

2)      Plaintiff's Entitlement to Lot 1-2-2 and Defendant's Privilege

"The Fifth Amendment guarantees just compensation when there is a governmental taking of private property for a public purpose." Id. at ¶ 20 (citing U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); and 48 U.S.C. § 1421b(f) (West, Westlaw through P.L. 109-21, 2005) ("Private property shall not be taken for public use without just compensation.")). The Fifth Amendment is made applicable to Guam through the Organic Act. In the governmental takings context in Guam, a "public use" is defined as "any use of purpose inuring to the benefit of the public generally or any substantial segment thereof. When the Guam Legislature declares a use to be public, such use shall be presumed to be an authorized public use, but the contrary may be proved." 21 GCA § 15103 (2011).

Guam law provides that, "[a]n estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing." 21 G.C.A. § 4101 (2011).

Although a party may not obtain an estate in land without a written document evidencing such grant under Guam's statute of frauds, a party may be privileged to enter property by consent, license, or through the creation of an easement. Restatement (Second) of Torts §§ 892–892D, and 167–190; *see also* N.L.R.B. v. Calkins, 187 F.3d 1080, 1092–3 (9th Cir.1999); and Lal v. CBS, Inc., 726 F.2d 97, 101 (4th Cir. 1984). In addition, the doctrine of equitable estoppel may operate to make a license irrevocable/permanent, and certain damages for inverse condemnation may be denied thereupon. Riverside Realty Co. v. City of New Orleans, 323 F.2d 74, 74 (5th Cir. 1963).

Thus, there are three separate questions which are determinative of whether the Defendant's concrete power poles rightfully remained on the land of the Plaintiff after April 20, 2004, and consequently, no action for inverse condemnation could lie: 1) whether an easement was created, which constituted a legally valid encumbrance on Lot 1-2-2, which ran with the land; 2) if no easement was created, whether a license/consent or other interest was created in Lot 1-2-2 by grant of the owner of Lot 1-2-2; and 3) if a license was granted, whether the Plaintiff was equitably estopped from ousting the Defendant and requesting damages for the use of the land because the license had become irrevocable through estoppel. Accordingly, the substantive laws governing license, easements, title, and land registration are all determinative as to the facts that are material to this issue.

"An easement is defined as 'an interest in land created by grant or agreement, express or implied, which confers on its owners a right to some profit or benefit, dominion, or lawful use out of or over the estate of another.'" Lizama v. Department of Public Works, 2005 Guam 12, ¶16 (Sup. Ct. Guam 2005)(quoting Costa Mesa Union School Dist. v. Security First Nat. Bank, 62 Cal.Rptr. 113, 118 (Cal.Ct.App.1967)). There are two tenements involved in every easement: (1) the dominant tenement, which holds the right to the easement; and (2) the servient tenement, upon which the servitude of the easement rests. 21 GCA § 7103; *see also* Lizama v. Department of Public Works, 2005 Guam 12, ¶16 (Sup.Ct. Guam 2005). Under Guam law, there are four primary ways in which an easement may be created: (1) by express grant; (2) by implication; (3) by necessity; and (4) by prescription. Id. at ¶19, n.2.

The first two methods of creating an easement require a written instrument delineating or referencing such easement. Id. at ¶20 (quoting 28A C.J.S. Easements § 53 (2004)), and ¶24. No written instrument specifically referencing an easement for power poles or concrete poles within Lot 1-2-2 has been presented by the Defendant or the Plaintiff in this case, and accordingly, there is no basis upon which the Court can find an express or implied easement.

An easement by necessity "typically arises where an owner severs a landlocked portion of his property by conveying such parcel to another." Id. at 38 (quoting Ludke v. Egan, 274 N.W.2d 641, 645 (Wis.1979)). There also has been no evidence that Lot 1-2-2 was or is landlocked, or that an easement arose by the necessity thereof. Accordingly, the Court finds that no evidence upon which the Court could find an easement by necessity was presented in this case.

Next, the creation of a prescriptive easement is substantially related to the concept of adverse possession, and a party claiming an easement by prescription must meet the requirements

of a statute of adverse possession. <u>Lizama v. Department of Public Works</u>, 2005 Guam 12, ¶19. n.2 (Sup.Ct. Guam 2005). However, in Guam, registered property may not be acquired through adverse possession. 21 GCA §29136 (2011). There is no dispute that Lot 1-2-2 is registered land, and has been registered since 1952. Further, none of the other elements required to meet the statute of adverse possession are present. *See* 21 GCA § 25111 (2011). Therefore, the Defendant could not acquire any portion of Lot 1-2-2 through adverse possession, and the Court can find no evidence to support a finding of a prescriptive easement.

In addition, Title 21 GCA § 4201 states:

> A transfer of real property transfers all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed.

21 GCA § 4201 (2011).

In this case, it is undisputed that the concrete power poles were placed on Lot 1-2-2 in 1989. Thus, any easement created by the Defendant in Lot 1-2-2 would have been created in 1989. Pursuant to 21 GCA § 4201, if an easement had been created, it would have been transferred with the property when acquired by the Plaintiff, and would have created a right in favor of the Defendant to continue use of such easement. However, in this case, it is also undisputed that the U.S. Naval government explicitly denied the Defendant the grant of any easement or any documents purporting to grant such, and the Defendant vacated the property at the request of the Defendant, thus relinquishing any right to the property.

Accordingly, considering the testimony that the U.S. Naval government refused to grant the Defendant an easement, the lack of evidence necessary for the creation of an easement, and

the Defendant's actual departure from Lot 1-2-2, including the removal of all structures from the land, the Court cannot find that the Defendant has or ever had an easement in Lot 1-2-2. As the Court has found that the Plaintiff did not have an easement through Lot 1-2-2, through any of the methods of acquiring an easement provided by Guam law, the Court must address whether the Defendant ever acquired a lesser interest in the land, i.e., whether the Defendant was privileged to enter Lot 1-2-2 through a license granted by the owner of Lot 1-2-2, and whether any such license could have become irrevocable through estoppel.

A license is express or implied consent from an owner of real property to perform an act or acts upon property, which may granted orally, or in writing. Markstein v. Countryside I, L.L.C., 77 P.3d 389, 398 (Wyo. 2003) (a license may be created by parol or a writing, or can be implied from the acts of the parties, from their relations, and from usage and custom); Colvin v. Southern Cal. Edison Co., 240 Cal.Rptr. 142, 146 (Cal.App. 2 Dist., 1987) (*distinguished on other grounds by* Ornelas v. Randolph, 17 Cal.Rptr.2d 594, 599 (Cal. 1993); Waterville Estates Ass'n v. Town of Campton, 446 A.2d 1167, 1169 (N.H. 1982). Like an easement, it is an interest in real property which is less than an estate, but constitutes the right to some use or benefit of the property. O'Shea v. Claude C. Wood Co., 97 Cal.App.3d 903, 909 (Cal. 1979). The primary distinction between a license and an easement is that a license is normally revocable at will by the grantor. Golden West Baseball Co. v. City of Anaheim, 31 Cal.Rptr.2d 378, 395 (Cal.App.4 Dist. 1994); Markstein v. Countryside I, L.L.C., 77 P.3d 389, 398 (Wyo. 2003).

For eminent domain purposes, a license does not constitute an estate in real property, and it is not subject to the statute of frauds, 21 GCA § 4101. Hubbard v. Brown, 785 P.2d 1183, 1186 (Sup. Ct. Cal. 1990); Forge v. Smith, 580 N.W.2d 876, 883 (Sup. Ct. Mich. 1998); *accord*

Northern Alaska Environmental Center v. State, Dept. of Natural Resources, 2 P.3d 629, 635, n. 25, n. 26 (Sup. Ct. Ala. 2000); *see also* Palacios Seafood, Inc. v. Piling, Inc., 888 F.2d 1509, 1511, 1514 (5th Cir. 1989); and Scogin v. U.S., 33 Fed. Cl. 568, 577–8 (Fed. Cir.1995). In light of the U.S. Naval government's refusal, and the lack of written documents required to establish the creation of an easement, the evidence indicates that the only interest acquired by the Defendant in Lot 1-2-2 was a license. In this case, the testimony of Andriano E. Balajadia unambiguously establishes that permission/license was granted to the Defendant by the previous owner of Lot 1-2-2, the U.S. Naval government, to build power poles and transmission lines on a portion of Lot 1-2-2.

Although a license is normally revocable by the grantor, there is one generally recognized exception to the rule, that is, license by estoppel. When a licensor grants consent to erect structures or make improvements on the licensor's real property, which is followed by an actual expenditure of labor on improvements to the servient tenement by the licensee, in reliance on the grant of consent, the license becomes irrevocable, generally through the operation of estoppel. Golden West Baseball Co. v. City of Anaheim, 31 Cal.Rptr.2d 378, 395 (Cal.App.4 Dist. 1994); Geddes v. Mill Creek Country Club, Inc., 751 N.E.2d 1150, 1157 (Ill. 2001); Dance v. Tatum, 629 So.2d 127, 128–9 (Fla. 1993); Holbrook v. Taylor, 532 S.W.2d 763, 764–6 (Ky. 1976); Hammond v. Mustard, 64 Cal.Rptr. 829, 831–2 (Cal.App. 1967); Powers v. Coos Bay Lumber Co., 263 P.2d 913, 950–3 (Or. 1953); Shepard v. Purvine, 248 P.2d 352, 361–2 (Or. 1952) (irrevocable license granted to construct water line); *see also* Restatement (Second) of Property § 519 (4), comments (e) through (g).

Page 15 of 60

Courts have determined that this doctrine is applicable in takings cases. In fact, "property which can be acquired by the exercise of the power of eminent domain may be acquired for the same public use by the application of equitable estoppel." Union Pac. R. Co. v. City of Greeley, 189 F. 1, 14 (8th Cir. 1911). In these cases, irrevocable license through estoppel will arise when an owner of property voluntarily imposes an apparent servitude on his or her property, and a governmental entity or municipality, acting reasonably and in good faith, believes that the servitude is permanent and in reliance upon that belief enters the property and makes improvements which it would not have made otherwise. Town of Essex v. New England Telegraph Co. of Massachusetts, 239 U.S. 313, 321–2 (1915); Lacy v. U.S. ex rel. and for Use of Tennessee Valley Authority, 216 F.2d 223, 225 (5th Cir. 1954); City of Eufaula, Okl. v. Meyer, 169 F.2d 463, 465 (10th Cir. 1948); accord Klugh v. U.S., 818 F.2d 294, 297, 299 (4th Cir. 1987); and Riverside Realty Co. v. City of New Orleans, 323 F.2d 74, 74 (5th Cir. 1963); see also Palacios Seafood, Inc. v. Piling, Inc., 888 F.2d 1509, 1511, 1514 (5th Cir. 1989)(verbal consent to governmental improvement project precluded award of compensation under takings clause based on damages caused by governmental action); Scogin v. U.S., 33 Fed. Cl. 568, 577–8 (Fed. Cir.1995)("A property owner reserves the right to exclude 'strangers ... but especially the Government' when the owner does not consent to a physical intrusion. Concomitantly, a property owner relinquishes the right to exclude when the owner consents to the entry, use, and occupation of the subject property.")(internal citation omitted.).

Guam has codified the doctrine of estoppel in 6 GCA § 5106(3), which provides:

Specification of Conclusive Presumptions. The following presumptions, and no others, are deemed conclusive: . . .(3) Whenever a party has, by his own declaration, act or omission, intentionally and deliberately led another to believe

a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act or omission be permitted to falsify it; . . . ."

6 GCA § 5106(3) (2011).

The doctrine of irrevocable license or license by estoppel has been applied such that a taking by a municipality of land necessary for its public purpose, with or without the consent of the owner, may, where elements of estoppel are present, be equivalent to title by condemnation against the owner:

> Where a public service corporation (prior to statehood), vested with the power of eminent domain, enters into actual possession of land necessary for its corporate purposes, with or without the consent of the owner, and the owner remains inactive, stands by, and permits a railroad or public service corporation to go on and spend large sums of money in constructing its roads, telegraph or telephone lines, pipe lines, plants, or other necessary fixtures, the owner is estopped from maintaining either trespass or ejectment, and will be regarded as having acquiesced therein, and is restricted to a suit for damages for the value of the land, on the theory that the appropriation by the public service corporation under such circumstances is equivalent to title by condemnation.

City of Eufaula, Okl. v. Meyer, 169 F.2d 463, 465 (10th Cir. 1948)(quoting St. Louis & S.F.R. Co. v. Mann, 79 Okl. 160, 192 P. 231, 232 (Okl. 1920)).

In such cases where the doctrine of equitable estoppel has been applied to effect a taking by a government entity, the acquiescent owner is estopped from attempting to oust the government from the property. In a few cases, the acquiescent owner has been entitled to recover damages for the value of the land, as in a regular takings case. Id.; and Lacy v. U.S. ex rel. and for Use of Tennessee Valley Authority, 216 F.2d 223, 225–6 (5th Cir. 1954). However, in more recent cases, recovery of damages has also been denied entirely based on license. Palacios Seafood, Inc. v. Piling, Inc., 888 F.2d 1509, 1511, 1514 (5th Cir. 1989)(no compensation allowed based on verbal consent to governmental action); Scogin v. U.S., 33 Fed. Cl. 568, 577–8 (Fed.

Cir.1995)(no compensation allowed where owner consented to governmental occupation); and Riverside Realty Co. v. City of New Orleans, 323 F.2d 74, 74 (5th Cir. 1963)(no compensation allowed where "all of the subject property had long been used by the public and maintained by the City as a public street with the knowledge and consent of the appellant and its predecessor in title.").

Despite the allowance of the recovery of damages in some cases where estoppel is present, the case before this Court presents an additional factor, i.e., the Plaintiff is not the acquiescent owner, but instead, is a grantee of the original acquiescent owner. Thus, the Court must address the issue of whether a subsequent owner or possessor in interest may maintain an action for damages against the governmental licensee.

In the one of two United States Supreme Court cases to specifically address the issue of whether the successor in interest of an acquiescent owner could maintain an action for damages against the governmental licensee, and a case nearly identical to the facts before this Court, Northern Pac. R. Co. v. Smith, 171 U.S. 260 (1898), the United States Supreme Court, in essence, applied principles of irrevocable license to a takings case, finding that where an owner of land, with knowledge of the facts and without objection, permitted a governmental corporation to take possession of such land, construct improvements, and operate upon the land, at great expense, the owner's grantee or successor in interest could not afterwards bring either an action of ouster or recover damages against the governmental corporation to whom the license was originally granted. *See also* Roberts v. Northern Pac. R. Co., 158 U.S. 1, 10–13 (1895)(after a railroad company, having the power of eminent domain, has entered into actual possession of land necessary for its corporate purposes, whether with or without the consent of the owner, a

subsequent vendee of the latter, who obtains his title to lands by the purchase of a quitclaim deed, takes the land subject to the burden of the railroad, and is estopped from claiming damages or ouster, because the right to payment from the railroad company if it entered under an agreement to pay, or to damages if it entered without authority, belongs to the owner at the time possession was taken.).

In the Northern Pac.R. Co. case, a railroad company obtained permission to build its railway across lands owned by the United States government. It filed plans to build in one location, but subsequently decided to build in a nearby location instead, which was also owned by the United States government, failing to file any documentation or plans for the new location. In 1873, the railroad company built the railroad tracks and a road in the new location, and began operating trains thereupon. As in the case before this Court, no easement was ever formally or properly granted for this construction and operation. Instead, the United States government permissively allowed the construction and operation of the railroad, without documentation, and afterward, transferred the land to a township, which subsequently deeded the land to a private citizen, Smith, in 1879. The railroad company continued to maintain its tracks and operations, and Smith filed suit claiming a taking, requesting ouster of the railroad and monetary damages of twenty-six thousand dollars for "the value of the use and occupation of the premises." Id., at 265 and 267.

The court held that because the United States government had permitted construction and use of the right-of way, only the United States government had the right to disapprove of the railroad's actions, and that once the right-of-way was fully built and in use, subsequent grantees of the land could not later object to such use, finding:

It is evident that when, in 1873, the Northern Pacific Railroad Company took possession of the land in dispute as and for its right of way, and constructed its road over and upon the same . . . the tract so taken was then part of the public lands [and] only the United States could complain of the act of the company in changing the location of its tracks from that previously selected. But, so far as this record discloses, the United States did not object to such change of location, but rather, by having, through the commissioners and the president, approved and accepted this part of the road when constructed, must be deemed to have acquiesced in the change of location as properly made.

Northern Pac. R. Co. v. Smith, 171 U.S. 260, 268 (1898).

In finding that Smith had no right to eject the railroad company or request damages for the railroad's use of the land, the United States Supreme Court found that Smith took the land subject to the permissive use that had been previously granted by the government, which use was open and obvious at the time he took possession of the property:

Whatever may be his rights to the land outside of that in possession of the railroad company, must it not be inferred that he bought subject to the public highway? It is found that in the month of June, 1873, the railroad had been constructed across this tract, and has since remained and been operated upon it; and it is hard to imagine what notice more distinct and actual could be given than that afforded by the operation of a railroad.

Northern Pac. R. Co. v. Smith, 171 U.S. 260, 270 (1898).

In making this determination, the United States Supreme Court specifically found that Smith had not tendered any lawful consideration in obtaining the land from the township, and thereupon, could not claim damages stemming from any previously granted right-of-way. Id., at 269.

The United States Supreme Court further found that even if the court were to consider the railroad's taking of the use of the right-of-way only as an exercise of eminent domain, applying takings principles to the case, Smith would still have no legal objection to the use of the property,

and could not, therefore, maintain his action, stating:

> [S]till the proof is that the railroad company completed its road over the land before the town site was patented, and before Smith obtained his conveyance. To acquire the benefit tendered by the act of 1864, nothing more was necessary than for the road to be constructed. The railroad company, by accepting the offer of the government, obtained a grant of the right of way, which was at least perfectly good as against the government. And be it further conceded, but not decided, that the railroad company, when it changed its route, after the filing of its map of definite location, lost its priority of right under the grant of the act of 1864, as against subsequent grantees of the United States, who obtained title before the actual construction of the railroad, and that the railroad company could only legally proceed under the exercise of its right of eminent domain; it still remains, as we think, under the facts of this case, that Smith could not maintain his present action, seeking to oust the company from possession of its right of way, and railroad constructed thereon.

Northern Pac. R. Co. v. Smith, 171 U.S. 260, 270–1 (1898).

The facts of the Northern Pac. R. Co. case are nearly indistinguishable from those presented in the case before this Court. In Northern Pac.R. Co., the court affirmatively found that the United States government owned the land when the permission was granted to the railroad for a right of way, and that despite the technical failures of recordation and registration concerning the actual right of way granted, the United States government had authorized and permitted such public use. In the current case, the U.S. Naval government owned the land and gave the government of Guam/GPA authorization to build power poles and transmission lines across Lot 1-2-2, for public use, but the Defendant also failed to properly record an easement for the right of way. In the Northern Pac. R. Co. case the subject property was transferred to a township by the United States government, and then granted to a private individual, Smith, who paid no consideration for the property. In this case, Lot 1-2-2 was transferred to the government of Guam by the U.S. Naval government, and then granted to a private individual, the Plaintiff, who also

did not exchange consideration for the grant of the property. In the Northern Pac. R. Co. case Smith requested ouster of the railroad company and monetary damages for "the value of the use and occupation of the premises in question for six years prior to December 28, 1891," Id., at 275, and in this case, the Plaintiff requests monetary compensation "for the temporary use and occupancy of the said Premises, commencing April, 2004, and continuing until Defendant GPA vacates said premises . . ." Pl.'s Compl., p. 2, ¶ 6.

This Court can find no factual or legal basis upon which to distinguish the United States Supreme Court's reasoning in the Northern Pac. R. Co. case, denying the plaintiff the recovery of monetary damages as a subsequent grantee of land. Therefore, Northern Pac. R. Co. constitutes binding authority for this Court. In the present case, the U.S. Naval government granted the Defendant government of Guam/GPA permission to construct power poles and transmission lines on Lot 1-2-2, and the Defendant expended labor and sums doing so, in reliance upon this permission, which it would not have done otherwise. The Defendant has presented the required evidence to support the application of the doctrine of irrevocable license by estoppel. Further, the Defendant has produced evidence that the former owner of Lot 1-2-2, the U.S. Naval government "intentionally and deliberately" gave the Defendant permission to build the power poles, which led the Defendant to believe that it was allowed to build and maintain the power poles on a portion of Lot 1-2-2, as required to show that the license became irrevocable through estoppel under 6 GCA § 5106(3). *See also* Town of Essex v. New England Telegraph Co. of Massachusetts, 239 U.S. 313, 321–2 (1915)(town authorities who permitted the location and construction of telegraph poles and lines along the highways without granting an express permit for such, and who acquiesced in their maintenance and operation for more than twenty years, were

estopped from maintaining an action against the company where the company expended large sums of money and perfected a great instrumentality of interstate and foreign commerce, the continued operation of which both the general public and the government had an important interest); and Roberts v. Northern Pac. R. Co., 158 U.S. 1, 10–13 (1895).

Most compellingly, the actual deed granted to the Plaintiff in this case consists of a quitclaim deed, and the deed specifically reserved any prior governmental use, as required under the Guam Excess Lands Act § 2(a); An Act to Develop Land-Use Policy and Plans for Certain Parcels of Land Belonging to the Government of Guam, Guam Public Law 22-145, An Act to Create the Guam Land Repatriation Commission, Guam Public Law 23-23; An Act to Provide an Environmental Clearinghouse for the Review of Federal Real Property Transfers, Guam Public Law 23-101; and An Act to Develop Land-Use Policy and Plans for Certain Parcels of Excess Federal Properties, Guam Public Law 23-141, under which Plaintiff took possession of Lot 1-2-2.

In McFadden v. Johnson, 72 Pa. St. 336, *1–2 (Sup. Ct. Pa. 1872), the Supreme Court of Pennsylvania held that the damages to land, occasioned by the construction of a railroad, were a personal claim which could only be made by the owner when the injury occurred, and that the claim did not run with the land, nor pass by a deed, even though the use was not reserved in the deed to the subsequent grantee. The United States Supreme Court followed this reasoning in Roberts v. Northern Pac. R. Co., 158 U.S. 1, 10–11(1895), finding that a subsequent taker by quitclaim deed could not maintain an action for damages against a railroad company with the power of eminent domain, because he took the land subject to the railroad's prior use and occupation, despite the fact that such use was not properly recorded. In the case before this Court, the Defendant's use *was* specifically reserved to the Defendant in the quitclaim deed

granted to the Plaintiff.

The quitclaim deed by which GEDA granted Lot 1-2-2 to the Plaintiff specifically states that the grant was made in accordance with Guam Public Laws 22-145, 23-23, 23-141, 25-45, 25-178, 26-36, and 26-100. Def.'s Ex. 4, p. 5, ¶ 1. In particular, P. L. 22-145, section 8, states that:

> Any land that is presently utilized for public easements such as roadways, water, power, sewer or underground telephone or communication lines *or other such government use or infrastructure uses* essential to the public's safety, welfare, health and protection is exempt from the provisions of this Act and *shall not be released to their former owners or heirs.*

P. L. 22-145 (emphases added).

Section 7 of Public Law 23-141 reiterates this reservation, and Public Law 23-23 further declares that "[i]t is the policy of the government of Guam that land returned by the federal government to Guam be returned to the estates that held such property . . . .Exceptions to this policy shall be: (a) Lands clearly under existing public use." P. L. 23-23 (2011). Pursuant to 21 GCA § 15103, "public use" is defined as "any use of purpose inuring to the benefit of the public generally or any substantial segment thereof." Id. The Court finds that the Defendant's use of power poles and transmission lines constituted a public use which was intended to be exempt from return to private persons under these laws, and therefore, any portion of Lot 1-2-2 which contained the Defendant's poles and lines was clearly in use by the Defendant on April 20, 2004, and was therefore specifically reserved, and not intended to be returned to the Plaintiff. Thereupon, the Plaintiff could not sustain a claim of taking.

Additionally, because Plaintiff took possession of Lot 1-2-2 by quitclaim deed, his possession of Lot 1-2-2 was only as good as the possession of the grantor, and subject to any reservations of the previous grantor. According to Black's Law Dictionary, a quitclaim deed is

not a warranty deed, which purports to convey absolute title and possession of the land, but rather, constitutes a deed that was subject to any legal encumbrances that could have been asserted against the grantor:

> [Q]uitclaim deed. A deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor professes that the title is valid. — Often shortened to quitclaim. — Also termed deed without covenants. Cf. warranty deed. [Cases: Deeds 25, 121.] "A quitclaim deed purports to convey only the grantor's present interest in the land, if any, rather than the land itself. Since such a deed purports to convey whatever interest the grantor has at the time, its use excludes any implication that he has good title, or any title at all. Such a deed in no way obligates the grantor. If he has no interest, none will be conveyed. If he acquires an interest after executing the deed, he retains such interest. If, however, the grantor in such deed has complete ownership at the time of executing the deed, the deed is sufficient to pass such ownership.... A seller who knows that his title is bad or who does not know whether his title is good or bad usually uses a quitclaim deed in conveying."

BLACK'S LAW DICTIONARY, quitclaim deed, (9th ed. 2009) (quoting Robert Kratovil, Real Estate Law 49 (6th ed. 1974)).

This definition has been espoused by the Supreme Court of Guam, specifically finding that a taker by quitclaim deed under the Guam Excess Lands Act § 2(a), Public Law 22-145, Public Law 23-23, Public Law 23-101, and Public Law 23-141, could only claim such interest as the grantor possessed, and reiterating: "A quitclaim deed only transfers whatever interest the grantor had in the described property at the time the conveyance was made." Taitano v. Lujan, 2005 Guam 26, 19 (Sup. Ct. Guam 2005)(quoting In re Marriage of Gioia, 14 Cal.Rptr.3d 362, 368 (Ct.App.2004)).

Under Guam's Land Title Registration Law, protections are specifically afforded to holders of certificates of title, pursuant to 21 GCA § 29142. That section provides:

§ 29142. Conclusiveness of Certificate of Actions of Ejectment or Partition or

Page 25 of 60

Possession. In any action or proceeding brought for ejectment, partitions, or possession of land, *the certificate of title of a registered owner shall be held in every court to be conclusive evidence*, except as herein otherwise provided, *that such registered owner has a good and valid title to the land, and for the estate or interest therein mentioned or described*, and that such registered owner is entitled to the possession of said land.

21 GCA § 29142 (2011)(emphases added).

In this case, the Plaintiff did not present a certificate of title for Lot 1-2-2, and therefore, is not entitled to assert the protections of Guam's Land Title Registration Law as against the Defendant.

As the Court finds that the U.S. Naval government had granted a license to the Defendant to construct and build its poles and transmission lines across Lot 1-2-2 in 1989, and that both the GEDA and the Plaintiff subsequently took possession of Lot 1-2-2 by quitclaim deed, the Plaintiff was only granted such possession of the land as had not been reserved to the Defendant by the original grantor, the U.S. Naval government. Accordingly, under the Plaintiff's deed, a license was reserved to the Defendant to use Lot 1-2-2 for its poles and transmission lines, and thus, there was no taking of Lot 1-2-2 by the Defendant.

### 3) Physical Occupation

Although the Court has determined that the Defendant was privileged to maintain its power poles across the Plaintiff's land, the Court finds that even if the Court were to determine that the Defendant was not entitled to occupy the Plaintiff's land at any time, the Plaintiff could not succeed in its inverse condemnation claim based upon the fact of the Defendant's presence on the land, because the Plaintiff has failed to prove an occupation which was substantial enough to constitute a taking.

"United States Supreme Court jurisprudence has recognized two types of takings, physical and regulatory." Cepeda v. Government of Guam, 2005 Guam 11, ¶ 21 (Sup. Ct. Guam 2005). "The longstanding distinction between physical and regulatory takings makes it inappropriate to treat precedent from one as controlling on the other." Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning, 535 U.S. 302, 303 (2002).

There is no evidence, nor any allegations made by the Plaintiff to support a finding of a regulatory taking in this case. Pl.'s Compl. Accordingly, the Court will only address the Defendant's physical occupation of Lot 1-2-2, and any possible resultant physical taking, under physical takings jurisprudence.

Government action that causes the placement of materials or structures on a landowner's property may constitute a physical taking. *See, e.g.,* Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall) 166, 181, 20 L.Ed. 557 (1871)("where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution."). However, not every occupation of private property resulting from government activity amounts to a compensable taking. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427, 429–31 (1982); *see, e.g.,* PruneYard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); Sanguinetti v. United States, 264 U.S. 146, 150, 44 S.Ct. 264, 68 L.Ed. 608 (1924); Nat'l By-Products v. United States, 186 Ct.Cl. 546, 405 F.2d 1256, 1275 (1969); Columbia Basin Orchard v. United States, 132 Ct.Cl. 445, 132 F.Supp. 707, 709 (1955); and Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed.Cir.2003).

In Loretto, the United States Supreme Court announced a *per se* rule regarding takings whenever there is a permanent physical occupation of land. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427, 434-7 (1982). However, in creating this bright line test regarding physical takings, the Loretto court explicitly differentiated between permanent and temporary physical invasions of land, stating:

> [T]his Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation. *See* United States v. Lynah, 188 U.S. 445, 468-470, 23 S.Ct. 349, 356-357, 47 L.Ed. 539 (1903); Bedford v. United States, 192 U.S. 217, 225, 24 S.Ct. 238, 240, 48 L.Ed. 414 (1904); United States v. Cress, 243 U.S. 316, 327-328, 37 S.Ct. 380, 384-385, 61 L.Ed. 746 (1917); Sanguinetti v. United States, 264 U.S. 146, 149, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924) (to be a taking, flooding must "constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property"); United States v. Kansas City Life Ins. Co., 339 U.S. 799, 809-810, 70 S.Ct. 885, 890-891, 94 L.Ed. 1277 (1950).

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 428 (1982).

The Loretto court further noted: "[m]ore recent cases confirm the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property. Id. at 430.

In making this distinction between permanent physical occupations and temporary physical invasions, the Loretto court referred to the oft-cited discussion of the takings clause in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). The analysis of Penn Central led the Loretto court to conclude that in cases of physical invasion which fall short of permanent appropriation, the fact that the government commits an invasion of real property is only one relevant factor in determining whether a taking has occurred, and upon finding such

invasion, a court must analyze the character and impact of the invasion in order to ascertain whether there was a taking. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-5 (1982)(citing to Penn Central, 438 U.S. at 124, 128).

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical invasion is a taking. As PruneYard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, n. 12 (1982).

The United States Supreme Court has previously categorized the installation of telephone poles and transmission lines as permanent physical takings:

> [T]he use made by the telegraph company is, in respect to so much of the space as it occupies with its poles, permanent and exclusive. It as effectually and permanently dispossesses the general public as if it had destroyed that amount of ground. Whatever benefit the public may receive in the way of transportation of messages, that space is, so far as respects its actual use for purposes of highway and personal travel, wholly lost to the public . . . .

St. Louis v. Western Union Telegraph Co., 148 U.S. 92, 99 (1893).

However, in the case before this Court, it is undisputed that the power poles and transmission lines have been removed from the subject property, and thus, any occupation of Lot 1-2-2 by the poles was only temporary. In such cases, the court must identify the interest that has been invaded by the government, and determine how significant an invasion of property rights has been effected. *See* United States v. Petty Motor Co., 327 U.S. 372, 378 (1946)(finding "[t]here was a complete taking of the entire interest of the tenants in the property.").

Therefore, in order to warrant compensation as a taking (as distinguished from a tort, i.e., trespass), the physical governmental invasion must meet a two-part test. First, the property owner must prove that the government invasion of property interests was either "the direct or necessary result" of governmental action or was "within contemplation of or reasonably to be anticipated by the government." Id. at 1356; see also, e.g., Sanguinetti v. United States, 264 U.S. 146, 150 (1924); John Horstmann Co. v. United States, 257 U.S. 138, 146 (1921); Barnes v. United States,538 F.2d 865, 871 (Fed Cir.1976); Eyherabide v. United States, 345 F.2d 565, 570 (Fed Cir. 1965); Columbia Basin Orchard v. United States, 132 F.Supp. 707, 709 (1955). Once this has been proven, the property owner must next show that "the government's interference with any property rights of [the plaintiff] was substantial and frequent enough to rise to the level of a taking . . . ." Ridge Line, Inc. v. United States, 346 F.3d 1346, 1357 (Fed.Cir.2003); Nat'l By-Products v. United States, 186 Ct.Cl. 546, 405 F.2d 1256, 1273, 1275 (1969); see also, e.g.,United States v. Dickinson, 331 U.S. 745, 749 (1947); United States v. Cress, 243 U.S. 316, 328 (1917); and Barnes, 538 F.2d at 870 (Fed Cir.1976).

In this case, there is no question that the Defendant's occupation of Lot 1-2-2 was the direct result of governmental action. Thus meeting the first part of the test, the Plaintiff must show that the Defendant's occupation of Lot 1-2-2 constituted an interference with the Plaintiff's property rights in Lot 1-2-2, which was substantial enough to constitute a taking.

"Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (quoting United States v. General Motors Corp., 323 U.S. 373, 378 (1945). A permanent physical occupation of real property will generally result in the complete extinguishment of all three rights.

Id. at 435–6. A temporary occupation of real property, in contrast, generally will not absolutely extinguish any of these rights, and even if a right is eliminated, such elimination will not always result in a compensable taking. Thus a more complex balancing test must be applied in such cases: "[a]lthough deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, it is clearly relevant." Id. at 436 (citing to Andrus v. Allard, 444 U.S. 51, 66 (1979)).

For example, in Northern Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336 (1879), the United States Supreme Court held that the city's construction of a temporary dam in a river in order to allow the construction of a tunnel was not a taking, even though the plaintiffs were temporarily denied access to their property, because the obstruction only impaired the use of plaintiffs' property.

The Court is presented, in this case, with an even less substantial interference with the Plaintiff's land and property rights than that presented in the Northern Transportation Co. case. In Northern Transportation Co., the plaintiff's land was flooded and rendered physically inaccessible for a short period. In that case, the plaintiff was, in fact, prevented from making use of the property. In contrast, no evidence of inaccessibility to Lot 1-2-2 was presented in this case. Even if the Court were to assume that the Defendant's occupation of Lot 1-2-2 actually prevented the Plaintiff's use and ability to profit from the land, in the absence of the deprivation of any other rights to the property, the Court cannot find that a taking occurred. The Plaintiff has presented no evidence that the Defendant's occupation disturbed its possession or disposition of Lot 1-2-2, and accordingly, the Court cannot find that the Defendant's occupation was a substantial enough interference with the Plaintiff's rights in the property to constitute a taking.

B)    Compensation

   1)    Legislatively Set Compensation

       a)    Public Law 22-80

Even if the Court did not dispose of Plaintiff's claim of inverse condemnation on the basis of privilege and the failure to prove a taking, the at least a portion of compensation would still be denied on the basis of a failure to request proper compensation under Guam Law, or prove the right to such compensation. The Supreme Court of Guam has discerned that Public Law 22-73, and its subsequent amendments direct the Court in all inverse condemnation cases. Cepeda v. Government of Guam, 2005 Guam 11, ¶¶12–17 (Sup. Ct. Guam 2005). In particular, Guam's highest court has recognized that Section 5 of Public Law 22-73 governs the compensation that may be afforded to landowners who successfully prosecute an inverse condemnation case. Id. at ¶12, n. 3.   The United States Supreme Court has also recognized that legislating bodies are entitled to dictate the form of compensation for inverse condemnation cases, and need not provide for compensation in cash. Blanchette v. Connecticut General Ins. Corporations, 419 U.S. 102, 150–1, n. 39 (1974).   On March 3, 1994, Section 5 of Public Law 22-73 (Bill No. 318) was amended by Public Law 22-80:6 and currently provides:

> Alternative compensation. The Governor is authorized to offer to an affected landowner any (1) of the following or combination thereof: (a) direct compensation at either fair market value of the land when taken or its current fair market value, as the landowner prefers; (b) area-for-area exchange; or (c) credit toward territorial income taxes due or to become due.

Guam Pub.L. 22-80 § 6 (March 3, 1994).

In Cepeda, the Supreme Court of Guam recognized that this law governs the compensation that may be offered to affected landowners in inverse condemnation cases, and noted that the

lower court had previously found that rental value was not an available remedy in an inverse condemnation case under this law. Id. at ¶7. However, based upon its finding that no taking had occurred, it declined to review the matter of compensation, stating: "[w]e will therefore not address whether the remedy upon inverse condemnation is an executive function for the Governor-not the court-to determine. We will also not examine . . . the right of Cepeda to recover the rental value of the property . . . ." Id. at ¶ 51.

Both the trial court and the Supreme Court of Guam recognized in Cepeda that there is a question as to whether a plaintiff in an inverse condemnation may recover rental value as compensation for a taking under Guam law. The trial court found that such recovery is not available under Guam law, finding that the plaintiff in Cepeda cited no local authority to support an award of rental income. Cepeda v. Government of Guam, Civil Case No. 1714-96 at pp. 10–11, *Decision and Order* (February 24, 2003). In this case, the Plaintiff has requested the rental value of the property as compensation[1], and, as in the Cepeda case, has cited no authority for the proposition that rent is an appropriate form of recompense. Such compensation does not appear to be available under the law, which, on its face, authorizes the Governor to offer only direct compensation for fair market value, area-for-area land exchange, or credit toward income taxes. Guam Pub.L. 22-80 § 6 (March 3, 1994), *see also* Cepeda, at ¶12, n. 3.

In interpreting Public Law 22-73 and its subsequent amendments, the Supreme Court of Guam has held that a plain language interpretation coupled with reference to the legislative findings of Public Law 22-73 is the proper method to determine the meaning of its provisions.

_____

[1] The Court recognizes that the Plaintiff also requested "such other sums and damages as may be proven at trial," Pl.'s Compl., p.2, ¶6, and will address other damages in other sections of this opinion.

Cepeda v. Government of Guam, 2005 Guam 11, ¶16 (Sup Ct. Guam 2005)(citing Bank of Guam v. Guam Banking Bd., 2003 Guam 9, ¶ 19 (quoting Pangelinan v. Gutierrez, 2000 Guam 11, ¶ 23) ("In cases involving statutory construction, the plain language of a statute must be the starting point.").

Thus, the Court must examine whether Public Law 22-73 and its subsequent amendments was intended to be a complete and all-encompassing scheme of compensating all takings of land, including the compensation of utility easements, such as that involved in this case. After an analysis of the plain language of the law and its legislative findings, the Court concludes that Public Law 22-80:6 was intended to provide a comprehensive compensation plan for all takings and inverse condemnation cases, including takings for public utility easements.

Section 1 of the Legislative intent if Public Law 22-73 states in part:

> [S]ince 1945, it has also been the practice of the government to take private property without any compensation or compensatory exchange when that land has been needed for such purposes as public roads, access to property, or *easements for public utilities*, the construction of public schools, the construction of water wells, and similar projects benefitting the public at large. This practice must cease immediately because it is contrary to the principles of eminent domain, justice and constitutional guarantees of property rights.

Guam Pub.L. 22-73 § 1 (Feb. 16, 1994) (emphasis added).

Under Section 2 of this law, the Governor was tasked to compile research on all land taken after 1945 for public use in order to enable the government to compensate those landowners whose lands had been taken for public use purposes, stating:

> The Governor shall immediately research and compile an exhaustive list of all private property which has been taken by the *various agencies* and departments of the government of Guam since 1945 . . . .Lands so taken shall include but not be limited to eminent domain, to condemnation, to outright taking, *to all government easements* (for any reason), and to all similar means of taking. . . . In

the process of compiling this report, the records of the Department of Land Management, the Department of Public Works, *the Guam Power Authority*, the Public Utility Agency of Guam, the Guam Telephone Authority, the Guam Airport Authority, the Department of Agriculture, and all other agencies which from time to time are involved in landtakings or *in the acquisition of easements*, shall be thoroughly and completely researched and examined.

Guam Pub.L. 22-73 § 2 (Feb. 16, 1994)(emphases added).

Specifically, under Section 4 of this law, "[t]hose private property owners whose land has been taken for utility easements shall have compensation paid from the funds of the agency which acquired the property rights." Guam Pub.L. 22-73 § 4 (Feb. 16, 1994).

These sections make it clear that the Guam Legislature was aware of government takings involving utility easements, and specifically intended this act to comprehensively cover compensation of any and all utility easements, including those taken by the Guam Power Authority. Thus, where the inverse condemnation action involves a taking of a utility easement by the Guam Power Authority, as in this case, Section 5 of P.L. 22-73, as amended by P.L 22-80 is applicable. Because the legislature is entitled to dictate the remedies allowable for inverse condemnations, the Plaintiff must be limited to the remedies provided under this law. Blanchette v. Connecticut General Ins. Corporations, 419 U.S. 102, 151, n. 39 (1974). Accordingly, the Plaintiff cannot recover rental value as a remedy for any taking of his property.

b)      Governor As a Party

Perhaps more importantly, the parameters of the remedy by law for inverse condemnation actions have been specifically prescribed by the Legislature of Guam in Public Law 22-80:6, and under this law, such remedy requires action by the Governor of Guam. Again, in the Cepeda case, the Supreme Court of Guam recognized that the trial court's ability to provide complete relief in

an inverse condemnation case, in the absence of the Governor as a party, was a valid issue which would have required the court's attention, however, in light of the finding that there was no taking, the Supreme Court of Guam declined to address the question, stating, "[w]e will therefore not address whether the remedy upon inverse condemnation is an executive function for the Governor-not the court-to determine." Cepeda v. Government of Guam, 2005 Guam 11, ¶51 (Sup Ct. Guam 2005).

Under Public Law 22-80:6, only the Governor is authorized to offer compensation to a landowner who is successful in an inverse condemnation case. This law appears to be in conformity with the will of the Guam Legislature as to all land takings by the government, when read in conjunction with 21 GCA § 15109, regarding payment for lands taken by eminent domain. This statute, regarding takings through eminent domain, clarifies that the intent of the Guam Legislature was for the Governor to give the final approval of any and all payments of compensation to landowners whose lands have been taken, stating:

> No action irretrievably committing the government of Guam to the payment of the ultimate award shall be taken unless the Governor of Guam shall be of the opinion that the ultimate award probably will be within the limits prescribed by the Guam Legislature or the Congress of the United States on the price to be paid.

21 GCA §15108 (2010).

Based upon these two laws setting forth the remedies for governmental takings, and requiring the Governor's approval for any payment of compensation, it appears that the action must be dismissed on the basis of the failure to join an indispensable party under Rule 19(b).

A court with proper jurisdiction may, *sua sponte,* consider the absence of a required person and dismiss for failure to join under Rule 19. Republic of Philippines v. Pimentel, 553

U.S. 851, 861 (2008); *see also* Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 111 (1968); and Minnesota v. Northern Securities Co., 184 U.S. 199, 235 (1902). Addressing this issue requires a two-step analysis. Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1042 (9th Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). First, the Court must determine whether the Governor is a person/entity "to be joined if feasible" under Rule 19(a), meaning that the Court first decides whether this person/officer is a "necessary" parties. Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 116--118 (1968).

If the Court determines that the absent party is "necessary," then the Court proceeds to the second step in the analysis as contained in Rule 19(b) to determine whether, "in good conscience the action should proceed among the parties before it, or should be dismissed, the absent persons thus being regarded as indispensable." Guam Rules of Civil Procedure Rule 19(b). If the nominated Governor is found to be an "indispensable" party rather than simply a "necessary" party, then dismissal of the action follows from that finding. Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. at 118--119, n. 15, 88 S.Ct. at 742–43, n. 15 (quoting Rule 19, Fed.R.Civ.P., advisory committee's note). In 2007, a newer version of Rule 19, based upon the 2003 Federal Rules of Civil Procedure was adopted by the Supreme Court of Guam. Id. at 107–09, 736–737; GRCP Rule 19 (2011). "Though the text has changed, the new Rule 19 has the same design and, to some extent, the same tension." Republic of Philippines v. Pimentel, 553 U.S. 851, 863 (2008). Accordingly, courts applying Rule 19, including the United States Supreme court, still use the case specific, two-step analysis handed down in Provident Bank. Id.

Rule 19(a) first defines three categories of "necessary" parties. The label of "necessary party" fits if, in the absence of the party, (1) complete relief cannot be accorded the present

parties; or (2) the absent party has an interest and is so situated that the disposition of the action would prejudice the ability of the party to protect its own interest; and disposition would subject the party to a substantial risk of multiple or inconsistent obligations. Guam Rules of Civil Procedure Rule 19(a).

Under Rule 19(a)(1) "it must appear that 'complete relief' cannot be accorded between those already parties," i.e. the Plaintiff and Defendant, without the participation of the Governor. Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir.1983) (citing Rule 19(a)(1); 3A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 19.07-1[1], at 19-128 (2d ed.1982)). "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." Id. In the first instance, the Plaintiff is requesting a single form of relief: monetary compensation of rental income for a governmental taking. Pl.'s Compl., p. 2, ¶ 6. Under P.L. 22-80:6 and 21 GCA §15108 (2010) any award of monetary payment requires the approval of the Governor of Guam.

Rule 19(a) recognizes that complete relief cannot be granted when the party maintaining practical control over the actions at issue is not joined in the suit. See, e.g., Tillman v. City of Milwaukee, 715 F.2d 354, 358 (7th Cir.1983) (state agency vested with responsibility of controlling, supervising, and approving participation in apprenticeship program plaintiff sought to rejoin should have been made a party to the action). In this case, the Governor controls the award of compensation, pursuant to Guam law and statute. The Seventh Circuit has affirmed that when a statute specifically requires that payment or compensation in a suit be provided by a particular governmental source, that governmental body or source is an indispensable party under Rule 19. Carver v. Sheriff of LaSalle County, 324 F.3d 947, 948 (7th Cir.2003) ("Carver II").

At the very least, it appears that the relief requested would require the Court to obtain the Governor's approval of any award, or if the Court were to issue such an award absent the Governor's participation, the Governor would be able to deny such relief. Thus, the relief requested by the Petitioners cannot be accorded among only the parties present, as the Governor is specially vested with the responsibility and authority to approve monetary awards for governmental takings.

Under the standard of Rule 19(a)(1), the Governor is a necessary party. The applicable statutes and laws establish that the Governor is vested with the duty to approve monetary settlements in government land takings cases, and has the executive power to interfere with or moot any order which would be issued by this Court "in order to effectuate the remedial phase of this litigation." Perez v. Cate, 2009 WL 462747, *1–2 (N.Dist.Cal. 2009) (Governor was a necessary party pursuant to Rule 19(a)(1) where he could override any remedy granted by the trial court). Therefore, the Court does not have the power to provide complete relief in the absence of the Governor under P.L. 22-80:6 and 21 GCA §15108 (2010).

As for the second category of necessary parties, the Court also finds that the Governor's ability to protect the Governor's official interests would be seriously impaired by the failure to join him as party, and thus, the Governor would be a necessary party under Rule 19(a)(2). The effect of Ex parte Young, 209 U.S. 123, 156-158 (1908), is to permit a state officer to be named as a party defendant so long as such officer has 'some connection' with the enforcement of a particular statute or law. The enforcement may be declared or specially created by the statute itself or may arise out of other, more general enforcement laws. Id. As noted in Ex parte Young, the important and material fact is the existence of some connection with the enforcement of the

act by virtue of the office held by the state officer.

In this case the Governor, and only the Governor, is specially authorized by Public Laws 22-73 and 22-80, to "offer to an affected landowner" the compensation available under the law. Further, as noted by the Supreme Court of Guam, "the goal behind Public Law 22-73 was quite expansive and included a requirement that the Governor compile a list of 'all private property which has been taken by the various agencies and departments of the government of Guam since 1945 and for which no compensation or grossly inadequate compensation has been given, either in terms of money or by land exchanges.'" Cepeda v. Government of Guam, 2005 Guam 11, ¶15 (Sup. Ct. Guam 2005)(quoting Guam Pub.L. 22-73 § 2 (Feb. 16, 1994)). These particularly imposed duties on the Governor constitute a sufficient 'connection with the enforcement of the act' under Ex parte Young to require the Governor's participation in the case, in order to protect the Governor's interests. See City of Altus, Okl., v. Carr, 255 F.Supp. 828, 834-835 (W.D.Tex.), aff'd per curiam, 385 U.S. 35 (1966).

In this case, the Governor does not merely have a "connection" to the laws at bar, the Governor has a "special relation" to the enforcement and execution of the statute at issue, a requirement for making the governor a party, first noted in Fitts v. McGhee, 172 U.S. 516, 530 (1899); more recently in Oliver v. Board of Educ., 306 F.Supp. 1286, 1288 (S.D.N.Y.1969); and Camacho v. Rogers, 199 F.Supp. 155 (S.D.N.Y.1961). Were the Court to grant the relief as requested by the Plaintiff, the Governor would possibly be faced with a court order to approve or provide compensation to the Plaintiff without ever having appeared before the Court. The result would leave the Governor open to subsequent suits from Plaintiff for injunctive relief or possible mandate, in order to force the Governor to approve any compensation granted. Under both

subsections of Rule 19(a), the Governor is an official person needed for just adjudication.

Having concluded that the Governor is a necessary party, who must be joined if feasible, the Court must determine whether it is feasible for the Court to join the Governor as a Defendant to the Plaintiff's complaint. See Guam Rules of Civil Procedure, Rule 19(a). During the two-year pendency of the case before trial, Plaintiff was afforded ample opportunity to amend its complaint to add new defendants and state tenable claims under the law, however, Plaintiff never attempted to add the Governor as a defendant. Rule 4 of the Guam Rules of Civil Procedure requires that each defendant named in a case must be personally served with a copy of a summons and complaint in order for the court to assert personal jurisdiction over each named defendant, unless such defendant files a waiver of service. GRCP Rule 4(a), (b), ( c), and (d)(2010). GRCP Rule 4(i) requires that service must occur either by delivering a copy of the summons and complaint to a designated employee of the Office of the Attorney General of Guam, or by mailing registered or certified copies of such to the Office of the Attorney General, and also sending copies of the summons and complaint by registered or certified mail to the officer of the government of Guam. GRCP Rule 4(i)(1) and (2)(2011). Service under Rule 4 must be made within 180 days of the filing, but may be extended by the Court for good cause. GRCP Rule 4( c), and (m)(2010). In the alternative, GRCP Rule 4(e)(1) also allows the service to be made by any other means authorized by the laws of Guam, pursuant to the conditions of 7 GCA § 14106 providing for service by publication and mailing.

As of the time of trial, there was no evidence that the Plaintiff had complied with GRCP Rule 4 or 7 GCA §14106. There is no evidence of service of a summons and amended complaint on the Governor and the Office of the Attorney General of Guam, as required under GRCP Rule

4. Further, there is no record that the Plaintiff has ever filed a verified affidavit setting forth facts to show that the Governor cannot be located on Guam, nor is there any order of the Court allowing service through publication and mailing. G.R.C.P. Rule 15(c) provides in relevant part:

> An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied, and within the time period provided by law for commencing the action against the party to be brought in by amendment, that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The rule specifically provides that the addition of new defendants or respondents will only relate back to the time of filing if the new defendant/s received notice of the suit against them within the time period provided for the commencement of the action *and* those new defendant/s should have known that the failure to join them initially was simply based on a mistake of identity. In this case, there is no evidence that the Governor was ever served with notice of this suit, or that there was any confusion as to the Governor's identity. On the contrary, the Plaintiff has maintained that the Guam Power Authority and the Government of Guam are a single entity against whom suit is properly brought, making no distinction between agencies or offices within the government of Guam.

The Court cannot now join the Governor as a defendant to the case, as the action has been tried without his participation. The time to bring suit against the Governor has passed with no notice to the Governor, and therefore the "relation back" doctrine cannot be applied.

Because the Governor is a necessary party who cannot feasibly be joined by the Court, the Court now turns to the next portion of the analysis. The relevant inquiry is whether the Governor is an indispensable party, thereby requiring dismissal of the action. Rule 19(b) sets forth four

factors to be considered when evaluating whether a person not joined as a party is indispensable. Guam Rules of Civil Procedure, Rule 19(b). The four factors are: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; and fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Id. If the equities show that the person is indispensable, then the action should be dismissed.

At this time, the interests of the absent party weigh in favor of the Court's abstention from making an award. The Court has been presented with no reason that the Governor would not be prejudiced by the inability to preserve his executive function. This prejudice cannot be lessened or avoided, as the only relief requested by the Plaintiff is that which would require the Court to invade this province. The public laws and statute involved require approval of the Governor for any award of compensation, thus rendering any judgment which could be fashioned in an attempt to avoid involving the Governor ineffectual and inadequate.

Most significantly, legislatures are entitled to prescribe the available remedies in inverse condemnation cases, and the legislature of Guam did just that, in enacting Public Laws 22-73 and 22-80, which provide for the form and mode of compensation to be offered to landowners. Blanchette v. Connecticut General Ins. Corporations, 419 U.S. 102, 151, n. 39 (1974). These provisions make it clear that compensation awards in inverse condemnation actions are an executive function, and the Governor is an indispensable party to any litigation requesting such award.

The final consideration tends to weigh in favor of the Plaintiff. The Plaintiff will have no opportunity to re-file its claim, as the Findings of Fact and Conclusions of Law will operate as a final adjudication of the Plaintiff's issue, once reduced to judgment. GRCP Rules 52(a) and 58 (2011). However, the Court notes that the Plaintiff chose which claim(s) to initiate, and which Defendant(s) would be named in the Complaint. Plaintiff failed to name the Governor in that Complaint. Three of the four factors under Rule 19(a) support the finding that the Governor is indispensable to the litigation, based on his duty and authority to exercise an executive function under Public Laws 22-73 and 22-80. Therefore, this Court should not "in equity and good conscience," proceed to make an award of compensation in the absence of the Governor.

2)    Common Law Compensation

a)    Insufficient Proof of Rental Value

Although the Court has found both that there was no taking, and that the Plaintiff has failed to show an entitlement to compensation in the form of rental value under the laws of Guam, such compensation is available under the common law, if there had been a taking found by the Court. However, the Court finds that the Plaintiff provided no evidence upon which the Court could determine the fair market rental value of the portion of Lot 1-2-2 which was occupied by the Defendant, and thus, even if the Court had determined that there had been a taking which was not subject to the limitations of Public Laws 22-73 and 22-80, the Court would still be unable to award rental value to the Plaintiff due to the insufficient proof presented at trial.

Where, as in this case, there has been a physical occupation of land by the Government, to determine the appropriate valuation method for calculating a just compensation award in an inverse condemnation or takings case under the common law, the Court first must ascertain

whether the Government's occupation deprives a landowner of permanent or temporary use of the subject property.

When there is a permanent government taking of private property, for which the Government permanently receives possession of the property (generally in the form of title in fee simple) the proper measure of just compensation to the landowner is generally "the fair market value of [the] property at the time of the taking." Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 474 (1973) (citing New York v. Sage, 239 U.S. 57, 61(1915)).

In contrast, a temporary taking denies a landowner all use of his property only for a limited time period, so the just compensation to which the owner is entitled is the fair market rental value for the use of the property during the time of the taking. Kimball Laundry Co. v. United States, 338 U.S. 1, 7 (1949) ("[T]he proper measure of compensation [in a temporary takings case] is the rental that probably could have been obtained...."); United States v. Gen. Motors Corp., 323 U.S. 373, 382 (1945)("Where this burden results from governmental action that amounted to a [temporary] taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period.").

Thus, it is well-established that a temporary taking, which denies a landowner all use of his property for only a finite period of time, requires just compensation in the form of the fair market rental value of the property. First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 315 (1987); Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1580-81 (Fed.Cir.1990); Yaist v. United States, 17 Cl.Ct. 246, 257 (1989); U.S. v. Shewfelt Inv. Co., 570 F.2d 290, 291 (9th Cir. 1977).

1)      If a Taking Occurred, In Order to Determine Compensation, it was

a Temporary Physical Taking

Neither Plaintiff nor Defendant argues that the taking in this case was permanent, as both concede that by the time of trial, GPA had removed all power poles from Lot 1-2-2, and therefore, any occupation of Plaintiff's land could have lasted, at most, for three and a half years. Further, although the Plaintiff and the Defendant have argued elements of regulatory takings jurisprudence in support of their relative positions regarding the amount of damages, there is no evidence to suggest that this case would constitute anything other than a physical takings case.

As there is no evidence to support a regulatory takings theory, and there is no evidence that the Government's occupation of the property was permanent, because all of the Defendant's structures have been removed from Lot 1-2-2, there is evidence only to support the hypothesis that if the Court had found a taking, any such taking by the Defendant would have constituted a temporary physical taking.

2)      Nature of Interest Taken in Plaintiff's Property

Once the Court determines the type of taking involved in a case, the Court cannot determine just compensation without first identifying the precise scope, nature, and extent of the interest taken. United States v. Causby, 328 U.S. 256, 267 (1946); United States v. Cress, 243 U.S. 316, 328-9 (1917); U.S. v. Wald, 330 F.2d 871, 872 (10th Cir. 1964)(in an inverse condemnation case, "[t]he interest taken by the [government] must be defined with precision. The judgments do not purport to define the property taken. This alone requires reversal.")(citing Batten v. United States, 306 F.2d 580, 581, 583, cert. denied 371 U.S. 955); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 437 (1982) ("Once the fact of occupation

is shown, of course, a court should consider the extent of the occupation as one relevant factor in determining the compensation due."). "[A]n accurate description of the property taken is essential, since that interest vests in the United States." United States v. Causby, 328 U.S. 256, 267 (1946)(citing United States v. Cress, 243 U.S. 316, 328–329 (1917).

The Plaintiff has failed to prove precisely what has been taken by the Defendant. The Court has determined that no easement was taken by the Defendant. The only interest taken by the Defendant was a license for the use of a right of way for its poles and transmission lines, which was temporary, as the Defendant has now removed all of these fixtures. Even if the Court found that a permanent easement had been taken, the Plaintiff still failed to prove the size of the easement or right of way by a preponderance of the evidence, in order to allow the Court to attach a value of compensation to the area of land taken.

First, there are no measurements concerning the area encompassed by the Defendant's poles on the 2004 map prepared by Mr. Frank L. G. Castro. Next, the Court does not find the Plaintiff's statements concerning the area encompassed by the poles to be credible evidence of the size of the encroachment. The Plaintiff initially stated that the width of the area encompassed was approximately 20 feet. The 2004 map prepared by Mr. Frank L. G. Castro shows that the length of Lot 1-2-2 nearest to the location of the poles is 149.595 meters. Taking judicial notice of the facts that one foot is equal to .3048 meters, and that in order to calculate a square area, one multiplies the width of the area by the length of the area, roughly, the Court finds that a width of 20 feet converted into meters (6.096 meters) multiplied by a length of 149.595 meters equals approximately 911 square meters. GRE Rule 201(b) and ( c)(2011). However, the Plaintiff later stated that the area encompassed was approximately 1,500 square meters. The Court finds these

statements to be conflicting, and no evidence was ever presented that the Plaintiff ever personally measured the area encompassed by the poles, therefore, the Court finds that this evidence does not establish the area of the alleged encroachment of Defendant's poles.

The expert presented by the Plaintiff, Mr. Nicholas Captain also did not provide any evidence upon which the Court could determine the area of Lot 1-2-2 encompassed by the Defendant. Mr. Captain did not testify as to the size of the encroachment, and Mr. Captain's consulting study states that it is based upon an assumed encroachment size of 1,277 square meters. This assumption appears to be based upon the appraisal conducted by the Defendant's expert witness, Mr. Michael Jury. The Defendant's appraisal contains approximate measurements of the area encompassed by the poles, however, the source of these measurements is undisclosed, and is accompanied by the caveat that all estimates of size should be confirmed by a licensed appraiser.

Not a single witness testified as to having personal knowledge of the measurements regarding the encroachment of the Defendant's poles and transmission lines across Lot 1-2-2, and no evidence of such personal knowledge was evident in the exhibits admitted at trial. Although an expert may testify as to the bases for the expert's conclusions, in this case, because the size of the encroachment is a required element of the Plaintiff's case, the Court requires evidence of personal knowledge in order to prove the size of the encroachment by a preponderance of the evidence. *See* GRE Rules 602 and 703 (2011). No such evidence was presented in this case, and therefore, the Court finds that the size of the area encompassed by the Defendant's poles and transmission lines was not established.

As an additional consideration, the Court is also without any evidence as to the length of time that the poles and transmission lines remained on the Plaintiff's property. No evidence of the date or even approximate date that the poles were removed from the property was provided to the Court. Accordingly, even if the Court were to attempt to assign a monthly rental value to the Defendant's occupation of Lot 1-2-2, as requested by the Plaintiff, the Court is without any information as to the number of months that the poles remained on the land after May of 2004, when Frank L.G Castro noted the existence of the power poles on Lot 1-2-2, and could not calculate any monthly damages on this basis.

### 3) Plaintiff has Failed to Prove Fair Market Rental Value

Having been unable to determine the precise scope and size of the Government's temporary occupation, the Court finds that it would have been unable to award compensation even if the Plaintiff had provided such information.

Where there is a temporary physical taking, the Court has already established that the common law compensation for such a taking is the fair market rental value of the occupied property. Indeed, this is the only remedy specifically requested by the Plaintiff. Pl.'s Compl., p.2, ¶6.

The fair market rental value of the occupied property is the price that a willing, hypothetical lessee would pay to a willing, hypothetical lessor for the period of the taking. See Kimball Laundry Co., 338 U.S. 1, 7 (1949); U.S. v. Shewfelt Inv. Co., 570 F.2d 290, 291 (9th Cir. 1977); Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed.Cir.1990); Yaist v. United States, 17 Cl.Ct. 246, 257 (Fed. Cir. 1989).

The Court is afforded ample discretion in determining the fair market rental value of a temporary easement. In the temporary taking case of Kimball Laundry, the United States Supreme Court described the process of calculating fair market rental value as an "informed guess" of what a reasonable lessee would have paid a reasonable lessor for the property interest taken. Kimball Laundry, 338 U.S. at 6, ("[S]ince a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place."). The United States Supreme Court concluded that in cases where there is a frequent exchange of property, the "market price" of similar leases becomes an "important standard of reference" for a court's determination of the fair market value of a rental that could have been obtained between a hypothetical lessor and lessee. Id. However, the burden in a takings case is always on the landowner to prove his asserted valuation of the allegedly condemned interest. United States ex rel. TVA v. Powelson, 319 U.S. 266, 273 (1943).

In the case before this Court, the Court can find no evidence submitted to support Plaintiff's claim of $2,500.00 in rental income per month, plus interest. The Court cannot conceive from whence this rate (or any other rate of rental income) for the occupied portion of Lot 1-2-2 is derived. The appraisal report and comparisons made by the Plaintiff's expert, Mr. Nicholas Captain, consist almost entirely of *sales transactions* in the vicinity of Marine Corps. Drive, from 2003 through 2004. Pl.'s Ex. 1, Tab 2. The Court finds none of the transactions analyzed and presented by the Plaintiff to be comparable to the Defendant's temporary, non-exclusive use of a right of way across Lot 1-2-2. Of the four transactions listed, only one transaction, Transaction No. 4, was a lease agreement, however, the monthly rental value for the

single lease agreement exhibited did not present comparable conditions of use to the Defendant's use and occupation of Lot 1-2-2. More importantly, the Plaintiff's expert, Mr. Captain, converted the lease value into a sales value, and conducted his analysis of valuation thereupon. Pl.'s Ex. 1, Land Price Analysis - Before Taking, and Land Price Analysis - After Taking.

In the case of U.S. v. Shewfelt Inv. Co., 570 F.2d 290 (9th Cir. 1977), the Ninth Circuit Court of Appeals reviewed a district court's decision declining to value condemned land using a formula based on the land's sale value on the basis that "the sale value presented was solely the result of speculation and had no relation to the land's actual use value." Id. at 292. The circuit court found: "[i]n this case there was no evidence of comparable leases from which a fair rental value could be derived. Accordingly, Shewfelt attempted to meet this burden by using a formula based on the fair market value for the sale of the land." Id. at 291. The Ninth Circuit rejected Shewfelt's before and after valuation, and affirmed the trial court's decision, stating, "[s]ince the speculation on this land had not been affected by the presence of the active artillery range, the district court did not err in concluding that the sale value had no relation to the value of a temporary leasehold." Id. at 292.

Accordingly, the Court rejects the Plaintiff's and the Defendant's evidence regarding valuation, as the Court finds that an analysis of similar rental/lease values constituted the correct method of valuation in this case, and no evidence of similar leases or rental values was presented upon which the Court could determine the fair market rental value. Instead, the Court was presented with fair market values for the sales of land. The Court finds that the sales price of Lot 1-2-2 is unrelated to the value of Lot 1-2-2 as a leasehold, and finds that the Plaintiff has failed to advance any persuasive reason for the Court to employ a sales valuation in a temporary

physical takings case such as this.

b)     Plaintiff Failed to Prove Other Loss

1)     Plaintiff Improperly Used "Before and After" Valuation To Determine Compensation

Recognizing that the Plaintiff also made the enigmatic request for "other such sums and damages as may be proven at trial," Pl.'s Compl., p. 2, ¶ 6, the more difficult question is whether the court should give credence to the Plaintiff's and Defendant's expert opinions on the "before and after" values of the land occupied by the Defendant, when the Court has found that no easement was granted, and was not able to determine the actual dimensions of the land occupied by the Defendant.

The Plaintiff has provided the Court with just compensation estimates which are solely based on sales price estimates of the value of the land before the taking, and after the taking, i.e., a "before and after" compensation analysis. The Plaintiff proposes that the Court employ the "before-and-after" method of computation, which is often utilized in cases involving easements, where the entire parcel is valued before and after the easement was imposed, and has only submitted evidence of compensation based on this theory[2]. *See* United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961); *see also* United States v. 8.41 Acres of Land, 680 F.2d 388,

---

[2]

In comparing the Plaintiff's "Land Price Analysis - Before Taking" and "Land Price Analysis - After Taking" comparison sheets, in Pl.'s Ex. 1, the Court notes that the sole difference between the two pages is the "Approximate Overall Quantitative Adjustments" and the resultant "Adjusted Unit Rate Per Square Meter" and "Fee Simple Land Price Conclusion" reached by Mr. Captain regarding the subject properties. How Mr. Captain reached the downward price adjustments is not apparent to the Court, as all other factors and fields on the two pages are identical, and no substantive differences concerning the Location/Access, Easement, or Size, which would affect the "Approximate Overall Quantitative Adjustments" appear on the "Land Price Analysis - After Taking" page. The reduction in price appears to be a mere conclusion which is made on no discernible factual basis contained in the documents.

392 (5th Cir.1982) ("Federal courts have long held that an appropriate measure of damages in a partial-taking case is the difference between the value of the parent tract before the taking and its value after the taking."). Oddly, based on these cases, the Defendant has also provided the Court with a "before and after" analysis of compensation for Lot 1-2-2. However, these cases have found that the "before-and-after-method" is properly suited for determining compensation for easements such as pipelines, transmission lines, or rights of access, *because* those types of easements are, essentially permanent, and therefore, more readily subject to "before-and-after" valuation. United States v. Virginia Electric Co., 365 U.S. 624, 632 (1961); *see also* United States v. Welch, 217 U.S. 333, 339 (1910) (when court finds that an easement has been taken, the before-and-after valuation of the dominant estate is employed to calculate the loss in the context of a complete physical destruction of the easement, because of the permanent deprivation to the landowner).

In Kimball Laundry, regarding temporary takings, the United States Supreme Court explicitly rejected the measurement of just compensation by "the difference between the market value of the fee on the date of the taking and its market value on the date of its return." Kimball Laundry, 338 U.S. at 7. In temporary physical takings cases, the comparable sales approach, i.e., the "before and after" analysis, is not the appropriate method of determining market value. Id., *see also, e.g.*, United States v. Commodities Trading Corp., 339 U.S. 121, 126 (1950); United States v. Cors, 337 U.S. 325, 333-34(1949); United States v. Causby, 328 U.S. 256, 261(1946); United States v. General Motors Corp., 323 U.S. 373, 379 (1945); and Seravalli v. United States, 845 F.2d 1571, 1575 (Fed.Cir.1988) ("[Trial] courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular

case.").

In this case, although the right-of-way used by the government consisted of the placement of power poles and transmission lines across Lot 1-2-2, which would ordinarily result in the application of the "before and after" valuation of the land, the Court has specifically found that no easement was granted, the government's use was not of a permanent nature, the government has removed all such structures, and full possession of all portions of Lot 1-2-2 has been restored the Plaintiff, thus negating application of the "before and after" method of valuation, as submitted by the Plaintiff, due to the temporary nature of the occupation. Oddly, both of the parties offered the court a "before and after" method by which to value the Defendant's temporary use of the property. As there was no easement granted, and the Defendant's use of any portion of Lot 1-2-2 was temporary, the "before and after" method of valuation is simply inapplicable to this case. Because Plaintiff has submitted evidence of no other valuation method, the Plaintiff has failed his burden to prove damages regarding the fair rental value of the property occupied, and the Court cannot grant Plaintiff's explicitly requested relief.

2)     Plaintiff's "Before and After" Valuation Also Constituted Evidence of Consequential Damages

An award of just compensation cannot include nominal or consequential damages suffered by the landowner as a result of the taking. Brown v. Legal Found. of Wash., 538 U.S. 216, 236 (2003); Marion & Rye Valley Ry. Co. v. United States, 270 U.S. 280, 282 (1926). Nominal or consequential damages include such estimates as lost profits or lost opportunity costs. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 130 (1978)("the submission that appellants may establish a "taking" simply by showing that they have been denied the ability to exploit a property

interest that they heretofore had believed was available for development is quite simply untenable."); United States v. General Motors Corp., 323 U.S. 373, 380 (1945)("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage."); Heydt v. United States, 38 Fed.Cl. 286, 306 (Fed. Cir. 1997). "It is a well settled principle of Fifth Amendment taking law . . .that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking." Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581-82 (Fed.Cir.1990).

When a proposed "before and after" analysis is based upon considerations of lost profits or opportunity cost, it constitutes a consequential damages claim—which is expressly prohibited in takings cases. Id. "In the present case, Yuba's claim for the difference in the value of the gold [located on the property] during the taking period and after the taking is precisely the kind of claim for consequential damages-here, lost profits-that is not an appropriate element of just compensation for the temporary taking of property." Id.

Specifically, a reduction in sales price for a piece of real property due to the temporary presence of government property is a consequential damages claim, and does not constitute a compensable loss in a takings case: "As in Yuba, the kind of damages sought by Mr. Heydt for the loss of the conveyance of the Idabel property-lost profits-is not an appropriate element of just compensation." Heydt v. United States, 38 Fed.Cl. 286, 307 (Fed. Cir. 1997). In the current case, the Plaintiff has only submitted evidence of a conjectural reduction in the sales price of Lot 1-2-2. However, the Plaintiff testified that he has never intended to sell the lot, and his only possible

damages were lost opportunity costs due to possible leases to either Payless Supermarkets, Inc., or a service station chain, as his measure of damages. No evidence regarding the possible lease prices available was presented, and no measure of his damages other than hypothetical sales prices can be found in the evidence presented at trial. Accordingly, no evidence of actual damages was submitted to the Court.

The reduction in sales price submitted by the Plaintiff is purely hypothetical. As the Defendant has now relinquished all occupation of Lot 1-2-2, the theoretical reductions in price presented by the Plaintiff for sales while the Defendant maintained power poles and lines can only constitute lost opportunity costs, because the Plaintiff has never intended to sell Lot 1-2-2, and is in full possession of the land now. In Heydt, the plaintiff had, in fact, conveyed his real property to a purchaser, and claimed that the government's temporary use of the premises decreased the actual sales price negotiated in the transaction, yet the Federal Court of Claims still denied his claims for lost opportunity cost. Id. at 306-7. In this case, no sale of the real property ever occurred, and thus, the Plaintiff is in an even less favorable position than the plaintiff in Heydt. Accordingly, the Court finds that the Plaintiff's submission of speculative "before and after" damages based on lost opportunity costs are consequential damages, which cannot be recovered in a takings case.

### 3) Plaintiff Failed to Prove Actual Loss

The Court's finding that no compensable damages have been proven by the Plaintiff is also supported by the legal maxim that only actual losses may be compensated in takings cases. Brown v. Legal Foundation of Washington, 538 U.S. 216, 235-6 (2003). United States Supreme Court jurisprudence holds that "[t]he constitutional requirement of just compensation derives as

much content from the basic equitable principles of fairness . . . as it does from technical concepts of property law." United States v. Fuller, 409 U.S. 488, 490 (1973) (internal citations omitted). An award of just compensation in a takings case should put a plaintiff in no better position than what the actual market for the particular property would have yielded, had the interest been placed on the market. A party "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." Olson v. United States, 292 U.S. 246, 255 (1934).

In accordance with these principles, the United States Supreme Court has consistently held that the measure of damages in a physical takings case is not what the government gains, but what the landowner loses. Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725 (1910)("the question is what has the owner lost, not what has the taker gained."); accord Kimball Laundry Co. v. United States, 338 U.S. 1, 23 (1949)(Douglas, J., dissenting) (noting the court's common ground that the government should pay "not for what it gets but for what the owner loses."); Marion & Rye Valley R. Co. v. United States, 270 U.S. 280, 282 (1926) ("Nothing was recoverable as just compensation, because nothing of value was taken from the company; and it was not subjected by the Government to pecuniary loss.").

In this context, when analyzing compensation for a governmental action that allegedly interferes with an owner's ability to use or develop the land, there can be no compensable interference if such land use or development was not permitted at the time the owner took title to the property, or if such government occupation was not the proximate cause of the harm alleged by the landowner.

In Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), the United States Supreme Court explained that the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by "'existing rules or understandings that stem from an independent source such as state law' [which] define the range of interests that qualify for protection as 'property' under the Fifth (and Fourteenth) amendments." Id. at 1030. Consequently, even when a governmental occupation deprives a claimant of some economically beneficial use of real property, the government will not be required to pay compensation if "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." Id. at 1027; see also, Penn Central, 438 U.S. 104, 124-25 (1978)("[T]he Court has dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes.").

In Sanguinetti v. United States, 264 U.S. 146 (1924) the Court rejected the plaintiff's takings argument on the basis that the governmental action of constructing a dam was not the direct or proximate cause of the damages alleged by the plaintiff, and determined that Sanguinetti's property had been subject to the same periodic overflow even before the canal had been constructed, and the extent of any increased overflow from the canal was "purely conjectural." Id. at 149.

Furthermore, in takings cases, when an owner acquires property with knowledge of pre-existing restrictions upon the development of that property, he assumes the risk of any economic loss. Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1177 (Fed.Cir.1994).

The Defendant submits that the placement of the power poles has had no impact on Plaintiff's ability to develop the subject property. According to the Defendant, the power poles have been removed, consistent with the Plaintiff's request, and constitute no interference with its use. Second, the Defendant argues that the power poles have had no impact on the access to Plaintiff's property or its value because Lot 1-2-2 is not zoned, and has never been zoned for any type of use while owned by the Plaintiff. Thus, despite the existence of the power poles, the Plaintiff could not make use of Lot 1-2-2 at any time, or for any purpose, while the property remained unzoned.

In this case, Lot 1-2-2 was neither zoned at the time of acquisition, nor by the time of trial, and there were no permitted uses of Lot 1-2-2. Accordingly, there is no basis upon which the Court could find that the Defendant's occupation of any portion of Lot 1-2-2 was the cause of any deprivation of use of Lot 1-2-2. In fact, the property's lack of zoning was the cause of any inability to develop Lot 1-2-2, which constituted an independent source of the harm alleged. The power poles and transmission lines were not the origin of the economic "harm" alleged by the Plaintiff, and their existence on a portion of Lot 1-2-2 did not interfere with the Plaintiff's reasonable interests in developing the land, because no development could have occurred due to the pre-existing condition of the lot's lack of zoning. Accordingly, "the proscribed use interests were not part of [the Plaintiff's] title to begin with." Lucas, Moreover, the Plaintiff has established no actual losses in this case due to the Defendant's occupation of Lot 1-2-2. In fact, the Plaintiff has incurred no actual loss as the Plaintiff has been entitled to the possession, use, and disposition of Lot 1-2-2 since April 20, 2004, and continues to have the possession, use, and disposition of Lot 1-2-2 since the removal of the poles and transmission lines. Consequently,

Page 59 of 60

there was no compensable taking of Lot 1-2-2 caused by the Defendant's occupation, and the Plaintiff is entitled to no compensation based upon the temporary occupancy. *See* <u>Sanguinetti v. United States</u>, 264 U.S. 146, 149 (1924)("in order to create an enforceable liability against the government, it is at least necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property."); and <u>Cepeda v. Government of Guam</u>, 2005 Guam 11, ¶ 34, (Sup. Ct. Guam 2005)("Review of the evidence reveals that the court erred in concluding that the culvert worsened the flow of water and caused Cepeda to suffer a physical invasion. . . . any water would have naturally drained there even without the existence of the culvert.").

Accordingly, the Court grants judgment in favor of the Defendant as to the claim of inverse condemnation. No attorneys' fees are awarded, and thus, attorneys' fees shall be borne by each party, respectively.

All findings of fact may be interpreted as conclusions of law and *vice versa*.

**SO ORDERED**: MAR 28 2011 .



**HONORABLE ARTHUR R. BARCINAS**
Judge, Superior Court of Guam

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam.

MAR 28 2011

Jerry T. Guerrero
Deputy Clerk, Superior Court of Guam